All right, our next case is Lamm v. DeVaughn James, number 19-3167. Mr. McKee, you may proceed. May it please the court. Good morning, judges. My name is Aaron McKee. First, let me apologize if I'm screaming at anyone. We're on Zoom, and I've still yet to get used to it and seem to that COVID has hit our office and our home this week, so I'm sitting in my kitchen, so if you hear a dog or a kid, they've been told not to, but I can't control them all. So let me apologize for that. It's our privilege to represent Plaintiff Appellant Allison Lamm, and we're going to try to reserve a couple of minutes for rebuttal. Anxiety disorders are the most common mental illness in the United States, affecting more than 40 million adults each year. The district court's order would eradicate the ADA. Based on the court's order, there would be no protection for employees with mental illness, no protection for employees taking leave for a disability, there would be no modified schedules, there wouldn't be any remote work for employees, and there also wouldn't be protection for employees that have medical conditions that are infinite in duration. The point of a reasonable accommodation is that employers must make some changes that can allow a disabled employee to perform the job, including modifying a policy. Based on the court's order, employers could institute a policy disqualifying all disabled employees. For example, an employer could have a policy requiring that all employees be able to walk upstairs. Maybe it'd be more helpful to focus on what is at issue in this case, and since we're not dealing, I don't know that you're, I think we ought to focus on what accommodation Ms. Lamm actually asked for from her employer. Well, there's been a process. Ms. Lamm was in constant communication, it's uncontroverted, she was in constant communication for several weeks with the employer and its office manager about needing assistance for the position. She was allowed each day that she needed time, either a half day or a full day, she asked and it was approved, and so what the district court did was it said that the only accommodation that Ms. Lamm asked for was in the letter from Kristen Croker, but that's not accurate. What accommodation do you say she asked for? Well, she asked for some time off. Didn't they offer her a week? Well, the week was offered in that disciplinary meeting on June 3rd, and that was after she'd already been missing time, which she'd been discussing with the office manager for that prior three weeks, and in that meeting, they told her, I mean that was a disciplinary meeting, they told her they want the old Allison back, they told her she wasn't a team player, you know, they threatened to terminate her, and then if you look at the deposition transcript of Richard James, when we asked about that weekend, Mr. James, or I'm sorry, not that weekend, that week off, Mr. James said something along the lines of, well, I don't know if it was specifically that week, or it might be another week, or maybe it was going to be a long weekend, but what Allison said was she didn't need it because she believed her medications were going to begin working, and that's what happened. So here, what the question should have been is, but for the anxiety absences, would Allison Lamb have been terminated? Sorry, instead, what the court focused on was what did Allison do or not do. As we know, once we enter into the interactive process, that duty to engage is on both parties, and so we talked about what could have or may have been possible, such as allowing her to take some work home, work at night, work on the weekends, and what we have here is we have a policy that the employer says, well, this is essential that someone be in the office 40 hours a week, Monday through Friday, at these specific times, but that was, but when you look at the history of what happened, you see that they had the only other person in a similar, in the same position, and she was able to work remotely for up to a year, and so we're not saying that she should have been entitled to work remotely or work at home the whole time, although really what we're saying is that, one, she wasn't, the short term, the short time that she was able to take off, we're talking about six or seven days. Mr. McKee, let me just jump in. So, the counselor's letter, Counselor Croker's letter of May 17, 2016, refers to a recommendation that Ms. Lamb be able to work half days on the days that she experiences intense anxiety during your work hours. So, that frames at least one request for an accommodation. When did Ms. Lamb request an accommodation other than submitting the letter, and what specifically did she ask for? Well, your honor, there's text messages in the record, there's emails. Well, fine. What was the accommodation that she requested? Well, each day that she needed a half day off or that day off. Well, that, but that's kind of a day-by-day ad hoc. I'm talking about the accommodation going forward. What was she asking for and when did she ask it? Okay, I guess, I guess I must misunderstand. So, let me, is, you say an ad hoc request is... I'm just asking, what accommodation did she ask for? Can you just state it in a sentence and then tell us when she asked for it? Well, every day that she needed to miss due to anxiety was a request for accommodation, and she was requesting those separately on each day that she suffered. Remember, there's no magic... But was she asking for that particular day? Yes. Was she asking for an accommodation for a period of time going forward? Your honor, she was asking for each day that she had an issue. She reported it to the employer and they said, okay, you can miss. At that point, she's begun the interactive process. I'm unaware of of any case, but maybe there are just, is what that says that that request for accommodation has to be in writing. Because look at it this way, is what we've done here is we've penalized Allison because she, she got backup information. She got information from her counselor. Now, also consider there's no written job description. With no written job description... Go ahead. I want to go back to what Judge Matheson's trying to do and what I started trying to do, which is to focus on what specific accommodation, what did she ask for and when did she ask for it? As I understand it, you're now saying that the accommodation that she wanted, which is what is asked for in the Croker letter, which is anytime she feels severe anxiety without prior notice to the employer, at that moment, she can say, I want to go home and have the rest of the day off. That's the accommodation that she requested? No, Your Honor. Isn't that what you just described? No. Okay. She began requesting accommodations before that letter and began a communication with the employer during that, before that letter. What accommodation did she request before that letter? Each time she requested the opportunity to go home for, if it was a half day or if she was at home, call in and, and, and, and be able to stay home. How is that different than what I just described? Because it was a short, because it was a short term duration. She was asking for a few hours or a day at a time. And after that letter, after that letter, there was no attempt to, to further accommodate. But, but just as importantly, Allison Lamb didn't need another accommodation after that. All she needed was for the time that she took off that had been approved for her disability. All she needed was for them not to be a reasonable accommodation for her to, anytime she's not feeling well, take the rest of the day off or not come in. Even when she's 150% over her allotted leave under their medical plan. No, Your Honor. Let me, let me say this is to have been 150% over, I believe the district court said 130. Yes. That could only be calculated in using her time that she took off for anxiety. Something that's really important here that I do want to address is that the burden for complying with the ADA is on the employer. So Allison did what she knew to do. Consider this. A lot of these cases talk about employers that have human resources departments. We're talking about an employer that had no policy. Its handbook didn't even mention the ADA nor how to request reasonable accommodation. It had no training. Its employees were unaware of how to request reasonable accommodation. The office manager was unaware about what a reasonable accommodation was. And so Allison each day advised the employer that she was suffering from anxiety and she needed to take some time off. Let's also consider the fact that leave, particularly short-term leave, is a reasonable accommodation. And what we see is that, again, the three days that she missed, you also note that they said okay. And so then, you know, finally, is that there was no attempt by the defendant to try to work through the interactive process. They didn't make any suggestions. They didn't even say, well, hey, look, we need somebody that's going to work here full time. They could have allowed, they said in their Monday through Friday, when as the clients need. Well, here we also have to look at what does an employee need. And so, you know, those things are really important. And the court also viewed everything in the light most favorable to the defendant and drew all of those conclusions. I mean, you can look throughout the briefs and you can see, and the depositions, you can see the number of times in which the defendant admits that her termination was based upon those anxiety absences. So again, the question should be, you know, what attempts did the employer make? The question really should start with, has the employer been put on notice that an employee may have a process and exchanged ideas in good faith. And here we have, by the admission of the defendant, an employee that has continued to tell the employer. And that letter. Mr. McKee, before you run out of time, let me just ask you this. You sued for three, three claims, failure to accommodate discrimination and retaliation. Did the district court address the discrimination claim? Judge, I don't, I don't believe so. I think it's similar to in punt where there's some confusion about the elements of certain claims because, and I get that this in disability, you know, for example, whether it's direct or indirect evidence, because of course, requests for reasonable accommodation intent is irrelevant. And so I think that I don't think the court directly did, but I also can understand how the court, if the court was intending that it was using the same analysis to dismiss both the claims, but it didn't say that. Well, if it didn't address the discrimination claim, are you suggesting that this court should go ahead and address it or should it be remanded? Well, I think since we're here, it probably ought to be addressed as opposed to a remand on that specific issue. One other thing that I want to point out, because it looks like I may not get any time for rebuttal, is I want to point out how much things have changed. A lot of these cases that are based upon pre-amendment cases. And so we need to evolve. The law needs to evolve. Because look at what we have here. We have handled... You'll need to make, wrap it up because why don't you complete your thought? Yeah. Is what this last sentence is, the entirety of this case, except for Allison Lamb's deposition, has been handled remotely. So we've shown that litigation doesn't have to be done in an office 40 hours a week between certain hours. Thank you for your time and attention this morning. Thank you, counsel. Okay. We'll turn to Mr. Rapp. Yes, your honor. May it please the court. My name is David Rapp. I'm a lawyer with the Hinkle Law Firm in Wichita, Kansas. And we represent Devon James LLC. We submit to the court that Judge Martin's decision was the right one. And Ms. Lamb claimed we were correctly, fairly handled in the trial court. And that Devon James did not violate the plaintiff's rights. And Judge Martin's judgment should be affirmed across the board. Now, Lamb's efforts to demonize Devon James should fail as an attempt to recast history. Lamb was terminated purely and simply due to her attendance problems. Lamb's attendance problems were not new in 2016. In fact, her annual review at the end of 2015 noted, quote, attendance needed improvement, close quote. As Judge McHugh's already noted, as of June 21st of 2016, Ms. Lamb had used an excess of 130% of her entire annual paid time off allocation. Devon James wasn't looking to terminate Ms. Lamb. It worked with her in an effort to keep her around. I'd like to tell you that prior to the litigation, this litigation, Lamb recognized Devon James' kindness and generosity in trying to She texted Brandi Ferris, who as you know is the office manager of Devon James, stating in part, quote, I can't thank you and the guys enough for giving me the opportunity to help myself with whatever I'm going through. I don't know what would happen if I didn't work for such understanding period, people, close quote. About 10 days later in an email to Rick James and others, Ms. Lamb said in part, quote, I just wanted to reach out to all of you and apologize for coming across as being disrespectful for being on my phone. I do know that I've been more than usual. I sincerely appreciate all of you and all you have done for me in the past few weeks. The last thing that I would want to do is come across as disrespectful and ungrateful, close quote. Ms. Lamb, as you know, is one of only two litigation case managers employed by law firm. They take good care of their employees. They have a goal of making sure that they take care of all of their clients' needs and meet their expectations. Could you just clarify, you mentioned at the beginning her termination, was she fired for unexcused absences, unscheduled absences, or just plain old absences in excess of the PTO policy? She was terminated for attendance issues, absences in general. The whole thing. She had missed all of this time. Hadn't the law firm approved the anxiety absences in May of 2016? Well, Judge, I don't know that you say necessarily approved. Either they said it was okay or it wasn't, or she just did it without. Were they approved or not? I don't know. They did not take any disciplinary action against her trying to work with her to help her through this problem. It wasn't until the request, including the written statement from her counselor about what she wanted as a reasonable accommodation, that she wanted to be in a position where she could essentially determine unilaterally that she needed to take the rest of the day off because she was suffering from her anxiety. Well, it wasn't, the Croker letter didn't say she'd take, wouldn't she be working from home if she wasn't in the office? They did not say that, John. They did not say that at all. It said she'd work half days. Well, was, okay, was the law firm's problem then with the half day or was the law firm's problem that she wasn't physically present? It seems like the physical presence in the office, um, you're, you're characterizing that as an essential function to use an ADA term. And one of your litigation case managers, uh, Ms. Thompson was allowed to work remotely. So what's the essential function here? Full-time work or work in the office? Your Honor, the essential function is full-time work in the office. Why does it have to be in the office? You didn't have Ms. Thompson in the office. Your Honor, the only reason Ms. Thompson was not in the office during that period of time in 2014 is because the firm had outgrown its facilities. Well, maybe it did, but, but didn't the, the remote work situation, uh, uh, work out at that point? It did not, Your Honor, because one of the important things about Ms. Thompson was that Ms. Thompson was available, uh, throughout the day, uh, to come in at essentially a moment's notice. I think that it's in the record, uh, that Ms. Thompson would come in on 10 minutes notice or so on. In fact, I believe she testified, uh, or gave it, it's in the record that she dressed for work while she was working at home because she knew that she could be summoned into the office on very short notice. So while she was working remotely during that period of time, while the office was, was, uh, uh, inadequate size, as soon as they moved into their new office, she was brought back in. And of course, Ms. Thompson would like to have worked at home. She asked repeatedly, almost at least on an annual basis, to be able to allow, to be allowed to work at home. Um, but she was told repeatedly, uh, that no, that's not the way we need to do things. Now, I think since you brought up Ms. Thompson, I think it's really important to point out, uh, a, uh, a statement that Ms. Thompson made regarding her, uh, desire to work at home. And this is, this is a, this is a quotation from Ms. Thompson's 2014 self-appraisal comments. Ms. Thompson's self-appraisal comments were, quote, the staff is strengthened by working with and learning from each other. This process increases individual skill levels, expands personal professionalism, and keeps everyone on track for living the core values. She recognized, as does Devon James, that the in the office on regular hours is so that they can collaborate with one another and get the benefit of not only what they know about things, but also what their colleagues know about things. This collaboration is a very important. I'm just, uh, counsel, I'm just trying to, to, to match up your arguments with the elements of a claim, uh, for, for a failure to accommodate. And I take it, uh, from your argument that, uh, uh, Devon James viewed being in the office and being there full time as both constituting essential functions. Is that your argument? That is my argument, Sean. And I might note, uh, that this idea of working from home, which of course everybody has, uh, uh, to some extent, uh, been, had the opportunity to, uh, sample during the COVID-19 era. Uh, it's been, it's been pretty well recognized. In fact, there's an article in the wall street journal today about it, that working from home is not a long shot. And importantly, uh, where you have employees who need to collaborate with one another, it is a real problem. Uh, so Devon James said it's a good idea. Uh, and, and, and this is their business plan that everybody works in the office so we can work together, collaborate and mutually assist one another. Um, Ms. uh, Ms. Lamb's request that she be able to leave, um, and work only half days when she felt anxiety was a significant problem because, you know, a reasonable accommodation can't be one that, that, uh, requires other employees to take on additional burdens. Uh, what we're talking about here is whenever Ms. Ms. Lamb was not in the office working, somebody else had to do her work. And that somebody else was either Velma Thompson, the other litigation case manager, or it was the lawyers. And when they did that, they did not only Ms. Ms. uh, Lamb's work, but they did their own work as well. Uh, and this court has recognized on more than a few occasions that, that being it on, on the job at the office, regular attendance is an essential function of a job. Uh, that's, and that's the way James sees it. And they all, they wanted Ms. Lamb to be able to come in and work for them on a regular basis, like other people could do. Ms. Lamb wasn't able to do that. And it's, it's, you know, it's unfortunate, but they needed to find somebody who could help them meet their client's needs. And that wasn't Ms. Lamb. Uh, and, and, and, and let's recognize too, that, that, uh, Devon James is unique in this desire to have the people there, a vet ready and available to work. Ms. Lamb worked for two more law firms after she left Devon James. Is that relevant to our consideration here? I think, I think it is in this, in this respect, and that is that it shows that law firms, especially expect their people to be there present so they can do the work. And if they can't be there present, then those people need to find someplace else to work. Ms., and Ms., Ms., Ms. Lamb had the same kind of attendance problems at both of those successive, uh, employers that she had with, with Devon James. It's unfortunate, you know, I mean, we all can be sympathetic to people who have, uh, psychological or emotional problems, but that, that doesn't mean that they get to do whatever they want to do or whatever they think they should do. They are businesses to run, they're clients to be taken care of. And that's what Devon James is trying to do. And they wanted to work with her, you know, as, as, uh, you know, that I think Judge Matheson, that, that, uh, when they met with Ms., Ms. Lamb on June the 3rd, they offered her a week off. Now, you know, that in isolation may, may sound like, well, that's kind of the unusual, where'd they come up with that idea? Well, the reality is, uh, and it's, that in about the 12th of May, 2016, Ms. Lamb sent an email, uh, a text to, uh, Ms. Ferris and said, hey, I just had a long conversation with my counselor and she told me that what I need to do is to get away for a few days. Uh, and, uh, so I'm, uh, I'm going to leave in a little while and I'm going to go out to Western Kansas. One of my uncles has a hunting cabin out there and I'm going to spend a couple of days alone by myself, uh, just like the counselor suggested. In other words, sort of free up her mind and, and, uh, think through things and so on and so forth. That was a recommendation from a counselor. Now, Ms. Lamb elected not to do that, not to follow the counselor's recommendation. And on June the 3rd, Devon James was offering her five, you know, five days, a week off, uh, with the, I think giving her the same opportunity that the counselor recommended earlier. Mr. Rapp, what do you think we should do with count two of the complaint for discrimination? Uh, your honor, I think that, that, uh, Judge, Judge Martin very definitely, uh, it's a footnote noted in a footnote in his opinion. All right. So your position is the district court did, uh, uh, directly address the discrimination claim and decided it. Is that your position? Absolutely. In fact, he said that the evidence was the same for the retaliation and discrimination on, on failure to show pretext. And, uh, the, the, the, uh, we very... Well, isn't that what he decided on retaliation is that she made a prima facie case, um, that you came up with a legitimate non-discriminatory reason for the, the termination and she failed to just your honor. Exactly. Okay. And so you're saying it, this, the court implicitly applied that same analysis to the discrimination case claim. Are you saying there's a footnote where the court expressly did that? Yeah. There's a footnote where the court addresses that, that it was addressing states that it was addressing not only retaliation claim, but also the discrimination part. All right. We, we, we can go back and look at the opinion. Counsel, your time is, uh, is up. We appreciate, uh, your argument, uh, Mr. McKee, we appreciate your argument as well. Um, uh, the time has expired and, uh, the, the case will... Mr. McKee, it seems like you're signaling me. I'm just wondering if I can have 10 seconds, judge, to just... 10 seconds. You got 10 seconds. All right. I want to point out that Velma Thompson specifically said her, that her work could be done 100% at home. That's it. Thank you. All right. Thank you, counsel. Appreciate the argument. Uh, the case will be submitted. Uh, counsel are excused.